# Exhibit A

Digitally signed by Advance Performance Exponents Inc.
Date: 2026.06.16 11:02:43 -05:00
Reason: Document Certification
Location: Court Document Management System

IE GRAND COURT OF THE CAYMAN ISLANDS
NCIAL SERVICES DIVISION

FSD CAUSE NO.        OF 2026

IE MATTER OF THE COMPANIES ACT (2026 REVISION)

AND IN THE MATTER OF TRAX LTD (Company Registration No. 330189)

---

## WINDING UP PETITION

---

**To the Grand Court**

The humble petition of Sona Enterprises DMCC, a company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates, having its registered office at Unit No. 3209, HDS Tower, Plot No: JLT-PH1-F2A, Jumeirah Lakes Towers, Dubai, United Arab Emirates (the "**Petitioner**") shows that:

**The Company**

1      Trax Ltd (the "**Company**") is a Cayman Islands exempted company incorporated on 8 December 2017 under the laws of the Cayman Islands with company registration number 330189.

2      The registered office of the Company is situated at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

3      The Company's principal place of business is Trax Retail Inc., 1001 Bannock Street, Suite 7, Denver, CO 80204, USA.

4      The Company's memorandum of association provides for unrestricted objects. The Company was established to act as a holding company for an international corporate group engaged in the business of providing artificial intelligence and computer vision-based retail intelligence software and technology services, including image recognition, retail execution, and related products (the "**Group**").

5    The Group's principal operating subsidiaries operated at least 4 distinct business units known to the Petitioner including:

   (i)    Trax Technology Solutions Pte Ltd (Singapore), which operated the Image Recognition business (the "**IR Business**");

   (ii)   Shopkick Inc. (the "**Engagement**" segment);

   (iii)  DMX Inc. (the "**Execution**" segment), and

   (iv)   Signal-Based Merchandising.

6    As at Q4 2024, the Group generated consolidated revenues of approximately US$130 million for the full year 2024.  The IR Business was the Group's most significant revenue-generating and profit-generating segment.  In Q3 2025 it contributed revenue of US$10.7 million out of total Group revenue of US$29.1 million (approximately 37% of Group revenue), with a gross margin of approximately 66%.  It was the only business unit of the Group generating positive EBITDA on a standalone basis.  For the full year 2024, the IR Business (then referred to as the CPG segment) contributed approximately US$54.7 million in revenue, representing approximately 42% of total Group revenue, at a gross margin of 62%.

**The Petitioner's Interest in the Company**

7    The Petitioner, Sona Enterprises DMCC, is a company incorporated in the Dubai Multi Commodities Centre, United Arab Emirates.

8    The Petitioner holds 190,000 ordinary shares in the Company (the "**Shares**"), acquired from T.C. Global Emporia Ltd ("**Emporia**") pursuant to a share transfer dated 31 January 2025.  The Petitioner paid US$10,000,000 for the Shares at a time when the Company carried a historic valuation of approximately US$1.6 billion. The Petitioner is a minority shareholder with a substantial economic interest in the Company.  The Petitioner's shares have been registered in its name since on or about 3 February 2025, being a period well exceeding six months immediately preceding the presentation of this petition, and therefore the Petitioner satisfies the requirements of section 94(3)(b)(i) of the Companies Act (2026 Revision) (the "**Act**").

9    On 3 June 2025, the Petitioner executed a Joinder and Assumption Deed with the Company, by which the Petitioner acceded to the Company's Amended and Restated Shareholders' Deed dated 14 December 2024 (the "**SHA**").

10   Neither the Company's Amended and Restated Memorandum and Articles of Association (the "**M&AA**") nor the SHA contains any provision restricting a shareholder from presenting a winding up petition to this Court.

**The Constitutional Framework**

11   The Company's governance is regulated by three principal instruments:

(a)   The M&AA, adopted by special resolution on 7 April 2021 (effective 19 April 2021) and further amended at the Extraordinary General Meeting held on 19 November 2024;

(b)   The SHA, executed on 19 November 2024, containing a mirror reserved matters regime; and

(c)   The Deed of Amendment to the SHA executed on 14 December 2024, to which the Petitioner acceded by Joinder and Assumption Deed on 3 June 2025.

12   Article 51A(c) of the M&AA provides that any sale of material assets or Subsidiaries of the Company, except as a result of or in relation to any intra-group restructuring, requires the prior approval of the holders of at least 75% of the issued and outstanding shares in the capital of the Company. The same requirement is imposed contractually by section 4.1(c) of the SHA.

13   Article 51A(d) of the M&AA and section 4.1(d) of the SHA require the same 75% threshold for any matter concerning the voluntary liquidation, dissolution, or winding up of the Company.

14   Article 51AA of the M&AA provides for a deemed consent mechanism whereby a non-Lead Investor shareholder who fails to return a written objection within 15 days of notice is deemed to have consented to the relevant matter. This mechanism does not apply to Lead Investors, who must affirmatively consent.

**Page 4 of 14**

**The Sale of the Image Recognition Business ("Project Thor")**

15    On 17 November 2025, the Company issued, and the Petitioner received, a notice to shareholders (the "**Project Thor Notice**") of its intention to sell the equity of its IR Business to G-3 Frax Acquisition LLC, a Delaware limited liability company affiliated with Gemspring Capital (the "**Purchaser**"), pursuant to an Equity Purchase Agreement (the "**EPA**").

16    The Project Thor Notice invoked Article 51A(c) of the M&AA and section 4.1(c) of the SHA as the applicable consent provisions.  A copy of the EPA was purportedly made available through a virtual data room (the "**VDR**") operated through a digital link included in the notice.

17    The Petitioner was unable to access the VDR using the link provided.  By letter addressed to the Board of Directors of the Company dated 27 January 2026 the Petitioner made express requests to the Company, including for a copy of the EPA. Those requests were ignored by the Company.  The Petitioner has never been provided with a copy of the EPA and has not been informed of the consideration paid for the IR Business.

18    Notwithstanding its inability to access the EPA, the Petitioner formally recorded its objection to the proposed transaction by returning its Form of Consent on 29 November 2025, checking the "does not consent" box ahead of the voting deadline of 3 December 2025.

19    The IR Sale nonetheless closed on 4 February 2026.  The transaction was publicly announced by the Purchaser Gemspring Capital on 5 February 2026.  A subsequent announcement by the Company's legal advisers, Holland & Hart LLP, confirmed that they had advised it on the sale of the IR Business.  According to those announcements, the assets transferred from the Company to the Purchaser comprised the Company's non-China IR business, operated through Trax Technology Solutions Pte Ltd (Singapore), together with the business of FORM, another retail execution platform which was said to have been combined with the IR Business by Gemspring Capital.

20    To the date of this Petition, the Company has not:

    (a)    provided the Petitioner with the EPA or any other documentation relating to the IR Sale;

(b)     informed the Petitioner of the sale proceeds received;

(c)     provided the Petitioner with a copy of any consent register demonstrating that the required 75% shareholder approval under Article 51A(c) was in fact obtained; or

(d)     provided any evidence that each of the Lead Investors affirmatively consented to the IR Sale as required (the deemed consent mechanism under Article 51AA not applying to Lead Investors).

21      The Petitioner is therefore unable to verify whether the 75% approval threshold mandated by Article 51A(c) of the M&AA and section 4.1(c) of the SHA was validly satisfied.

**The Financial Position of the Company Following the IR Sale**

22      As at 30 September 2025, the last balance sheet date for which shareholder updates are available, the Group's consolidated financial position was as follows:

(a)     Total assets: approximately US$179.8 million;

(b)     Total liabilities: approximately US$174.7 million;

(c)     Total shareholders' equity: approximately US$5.1 million;

(d)     Non-current borrowings: approximately US$108.9 million — up from US$72.9 million at 31 December 2024, an increase of US$36 million in nine months; and

(e)     Cash and cash equivalents: approximately US$22.4 million.

23      In Q3 2025 (the last quarter for which financial data is available prior to the IR Sale closing in February 2026), the Group recorded:

(a)     Revenue of US$29.1 million, a decline of 14% year-on-year;

(b)     Adjusted EBITDA of negative US$4.6 million;

(c)     Interest expense of US$9.7 million for the quarter alone; and

(d)     Net loss of US$19.0 million for the quarter.

24      With the disposal of the non-China IR Business — which was said by the Company to be the only EBITDA-positive segment of the Group and the primary driver of revenue — the remaining 3 business units were all said to be loss-making at both

the gross and EBITDA level as at Q3 2025. The Company has given no updated financial information to the Petitioner since the IR Sale closed.

The Petitioner is not aware of the amount received by the Company for the IR Business or what has become of the sale proceeds. The Company has not disclosed to the Petitioner whether the proceeds were sufficient to discharge substantial bridge loan facilities and other borrowings. The company has not provided any updates to the Petitioner post sale and has not informed the Petitioner of the financial position of the Company or of the net asset value of its shares.

**The Proposed Voluntary Liquidation**

On 21 May 2026, the Company issued a Notice to Shareholders (the "**VL Notice**") proposing that the Company be placed into voluntary liquidation and that a voluntary liquidator be appointed. The VL Notice invokes Article 51A(d) of the M&AA and section 4.1(d) of the SHA. The consent deadline was on Saturday, 6 June 2026.

The VL Notice was not sent directly to the Petitioner by the Company. The Petitioner received it only because an unrelated shareholder of the Company contacted Sona and informed it of the VL Notice. Subsequently, Sona's predecessor shareholder, Emporia, forwarded the VL Notice to Sona. The Company's failure to provide the VL Notice to Sona raises serious concerns about the Company's corporate governance and the competence and good faith of its directors and officers.

No information whatsoever has been provided to the Petitioner about:

    (a)    the consideration received for the IR Business;

    (b)    the current assets and liabilities of the Company following completion of the IR Sale;

    (c)    whether the Company is solvent;

    (d)    what assets (if any) remain in the Company available for distribution to shareholders; and

    (e)    who is proposed to be appointed as voluntary liquidator or on what terms.

29      If the directors purport to place the Company into Voluntary Liquidation then any assets remaining in the Company will be at immediate risk of distribution or dissipation before this Court can intervene, with no court supervision and no independent oversight of the process.

**Invalidity of the Proposed Voluntary Liquidation**

30      The directors' proposed process to place the Company into Voluntary Liquidation is defective and invalid as a matter of Cayman law because Section 116(c) of the Act prescribes that a company may be placed into voluntary liquidation only *"if the company resolves by special resolution that it be wound up voluntarily"*.

31      Section 60 of the Act defines a Special Resolution as a resolution passed either: (a) by a majority of not less than two thirds of shareholders voting in person or by proxy at an Extraordinary General Meeting ("**EGM**"); or (b) by a unanimous written resolution of all members.  There is no third route.  The Act does not permit a company to be placed into voluntary liquidation by a combination of express consents from some members and a deeming provision treating the silence of others as consent.

32      The VL Notice purports to obtain the requisite approval by relying upon the deemed consent mechanism in Article 51AA of the M&AA, which treats a non-Lead Investor shareholder's failure to object within 15 days as consent.  This mechanism cannot satisfy the statutory requirement for a Special Resolution in either of its two prescribed forms because:

    (a)      it does not constitute a resolution passed at an EGM, because no EGM has been or is proposed to be convened; and

    (b)      it does not constitute a unanimous written resolution of all members, because:

        (i)      the Petitioner has not signed or otherwise executed any written resolution approving the voluntary liquidation; and

        (ii)      a deeming provision treating silence as consent cannot, as a matter of law, constitute the actual written consent of a member that is required under the Act.

33    The M&AA is also internally inconsistent in this regard.  Article 51A itself requires a 75% majority for voluntary liquidation and expressly refers to obtaining that approval "*in the form of either a shareholder's resolution adopted at a general meeting or written consents from such Shareholders*".  The term "*Special Resolution*" in the M&AA is defined as having the same meaning as in the Act.  Article 67 of the M&AA provides that a written special resolution is valid only when "*signed by or on behalf of all members*".  The deemed consent mechanism in Article 51AA is therefore internally inconsistent with Article 67 and with the M&AA's own definition of a Special Resolution.

34    Absent the execution of a written resolution approving voluntary liquidation by or on behalf of every member of the Company (including the Petitioner, which does not consent), the Company is required to convene an EGM at which a resolution to wind up voluntarily must be passed by a majority of not less than 75% of voting members.  No such EGM has been convened.  The purported voluntary liquidation process initiated by the directors on or around 21 May 2026 is therefore invalid and of no legal effect.

35    The directors' attempt to place the Company into voluntary liquidation by an invalid process — one that deliberately circumvents the statutory requirements for shareholder approval and denies minority shareholders such as the Petitioner the protection of a general meeting — is itself conduct that supports the conclusion that it is just and equitable for the Company to be wound up under the supervision of this Court.

**Grounds for Winding Up on Just and Equitable Grounds**

*Invalidity of the Directors' Voluntary Liquidation Process*

36    As set out in paragraphs [30] to [35] above, the process by which the directors have purported to place the Company into voluntary liquidation is invalid as a matter of Cayman Islands law.  The directors have knowingly initiated a process that does not comply with section 116(c) of the Act and that relies upon a deemed consent mechanism which is both statutorily impermissible and internally inconsistent with the M&AA.

37    This conduct is further evidence of the directors' willingness to act outside the proper constitutional and statutory framework of the Company in order to achieve a desired outcome — the winding up of the Company without independent review of their prior actions in selling the IR Business or Court supervision of the liquidation and subsequent dissolution of the Company. The use of an invalid voluntary liquidation procedure to extinguish the rights of minority shareholders and avoid scrutiny of the IR Sale and the application of its proceeds demonstrates a lack of probity and a disregard for the legitimate interests of shareholders such as the Petitioner.

38    In the respects aforesaid, and in addition to the other grounds pleaded herein, the directors have acted unfairly and/or oppressively towards the Petitioner and/or the affairs of the Company have been conducted with a lack of probity, and the Petitioner has further and additionally justifiably lost confidence in the management of the Company.

*Denial of Information*

39    The Petitioner's request for a copy of the EPA and for information was ignored by the Company. Prior to the IR Sale, the Petitioner was locked out of the VDR containing the EPA despite that document being expressly referenced in the Project Thor Notice as the operative transaction document.

40    Following completion of the IR Sale, the Company has failed to provide the Petitioner with information about the sale consideration, the financial position and debt of the Company, the application of the sale proceeds, or the existence or quantum of assets remaining available for distribution to shareholders. The Petitioner has been kept in complete ignorance of the state of its investment.

41    The Company also failed to notify the Petitioner of the proposed voluntary liquidation directly, notwithstanding that the Petitioner has been a registered shareholder since February 2025. The Petitioner received the VL Notice only through the fortuitous intervention of its predecessor shareholder. This failure is consistent with the Company having failed to maintain an accurate and up-to-date Register of Members as required under the Act of the Cayman Islands and the Petitioner infers that the affairs of the Company have not been conducted in accordance with the lawful requirements imposed on the directors and further infers

that the directors have failed to adequately cause the records of the company to be maintained according to law.

42    In the respects aforesaid, the Petitioner has been excluded from management and denied information to which it is entitled as a shareholder and the affairs of the Company have been conducted in disregard of the Petitioner's legitimate interests as a minority shareholder.

*Lack of Probity and Justifiable Loss of Confidence in Management*

43    The Petitioner has justifiably lost confidence in the management and directors of the Company.  In particular:

(a)    The directors caused the Company to sell its most valuable asset — the IR Business — notwithstanding the Petitioner's formal objection, while simultaneously denying the Petitioner access to the transaction documents and failed to provide any information to the Petitioner whatsoever;

(b)    The directors caused the Company to incur substantial additional borrowings — from approximately US$72.9 million in December 2024 to approximately US$108.9 million by September 2025 — without providing any explanation to the Petitioner as to the purpose of those borrowings or how they were to be serviced, still less repaid;

(c)    The directors have failed to maintain an accurate Register of Members, such that the Petitioner — a registered shareholder for over 16 months — was not notified of the proposed voluntary liquidation;

(d)    The directors have sought to place the Company into voluntary liquidation — a process that would extinguish the Company and distribute (or dissipate) its remaining assets — without disclosing to the Petitioner any information about the Company's financial position or the terms on which that liquidation would be conducted; and

(e)    The totality of the conduct described above suggests that the directors and/or the Lead Investors have acted for an improper purpose — namely to asset-strip the Company and then dissolve it

voluntarily to avoid accountability for their conduct and to deprive minority shareholders such as the Petitioner of any opportunity to investigate or recover their investment.

44    In the respects aforesaid, the directors and/or majority shareholders have acted unfairly and/or oppressively towards the Petitioner and/or the affairs of the Company have been conducted with a lack of probity, and the Petitioner has justifiably lost confidence in the management of the Company.

*Need for Independent Investigation*

45    In view of the facts pleaded above, the Petitioner considers that there is a need for an independent insolvency practitioner to be appointed as official liquidator to investigate:

(a)    the consideration received for the IR Business, the terms of the EPA and the application of the sale proceeds;

(b)    whether the 75% consent threshold required by Article 51A(c) of the M&AA was validly satisfied for the IR Sale, and in particular whether the Lead Investors affirmatively consented as required;

(c)    the current financial position of the Company, including the nature and quantum of the borrowings and the identity of the lenders;

(d)    the availability of claims against current and/or former directors of the Company for breach of fiduciary duty or otherwise;

(e)    if there is a valuable IR Business that is owned and operated by the Company in the People Republic of China; and

(f)    whether any assets of the Company remain available for distribution to shareholders or sale upon commercial terms in arms length transactions.

46    Without the appointment of an official liquidator by this Court, there is a real and immediate risk that the Company will be placed into a voluntary liquidation process which is not subject to independent supervision, that the remaining assets of the Company will be distributed or dissipated at an undervalue in related party transactions, and the directors will take steps to rapidly dissolve the Company so that the Petitioner will be permanently deprived of any opportunity to investigate

or recover its US$10 million investment in the Company made only 16 months ago at the time of filing.

47    In the premises, and further having regard to the invalidity of the directors' purported voluntary liquidation process, their clear intention to ignore the laws of the Cayman Islands and the Company's constitutional documents and its obligations under the SHA and their failure to conduct the affairs of the Company in accordance with good corporate governance standards for the benefit of the Company as a whole, it is just and equitable for the Company to be wound up by this Court.

Your Petitioner therefore humbly prays that:-

1    The Company be wound up in accordance with section 92(e) of the Companies Act (2026 Revision) of the Cayman Islands.

2    Graham Robinson of Crowe LLP, 94 Solaris Avenue, Camana Bay, Grand Cayman, PO Box 30851, KY1-1204, Cayman Islands  be appointed as official liquidator of the Company (the "**Official Liquidator**").

3    The registered office of the Company be moved to Crowe LLP, 94 Solaris Avenue, Camana Bay, Grand Cayman, PO Box 30851, KY1-1204, Cayman Islands.

4    The Official Liquidator shall not be required to give security for his appointment.

5    The Official Liquidator be authorised to exercise within and outside the Cayman Islands any of the powers conferred on him by the Court pursuant to section 110(2) and Part II of the Third Schedule of the Companies Act (2026 Revision) without further sanction or intervention of the Court.

6    The Official Liquidator be authorised to carry out any act or exercise any power considered by him to be necessary or desirable in connection with the liquidation of the Company and the winding up of its affairs, and to prevent the dissipation of the assets of the Company and its subsidiaries in any jurisdiction.

7    The Official Liquidator be authorised to take any such action as may be necessary or desirable to obtain recognition of the Official Liquidator and/or his appointment in any other relevant jurisdiction, and to make applications to the courts of such jurisdictions for that purpose.

8    The Official Liquidator has the power to appoint agents in the Cayman Islands, the United Arab Emirates, Singapore, the United States of America and elsewhere to do any business contemplated by any order or the conduct of the liquidation which he is unable to do himself or which can more conveniently be done by an agent.

9    The Official Liquidator be authorised to take control of such direct and/or indirect subsidiaries of the Company and associated companies, businesses or other entities in which the Company holds an interest, wherever located, as the Official Liquidator shall think fit; to call or cause to be called meetings, sign resolutions, and take such other steps as the Official Liquidator shall consider necessary to appoint or remove directors, officers and/or managers of such subsidiaries and associated companies, and to take such other action in relation to all such subsidiaries and associated companies as the Official Liquidator shall think fit for the purpose of protecting the assets of the Company and managing its affairs.

10    The Official Liquidator be at liberty to appoint counsel, attorneys and/or any other professional advisors, whether in the Cayman Islands or elsewhere, as he may consider necessary to advise and assist him in the performance of his duties, on such terms as he may think fit, and to remunerate him out of the assets of the Company.

11    The remuneration and expenses of the Official Liquidator shall be paid out of the assets of the Company.

12    The Official Liquidator be at liberty to apply generally to the Court to make such orders for regulating the future conduct of the affairs of the Company as the Court shall see fit.

13    A declaration that any purported resolution or process to place the Company into voluntary liquidation initiated pursuant to the VL Notice dated 21 May 2026 is invalid and of no legal effect.

14    An order that the Company, its directors, officers, and professional advisors (including but not limited to Maples Corporate Services Limited and any proposed voluntary liquidator) forthwith provide to the Petitioner and/or the Official Liquidator all information and documentation relating to: (a) the IR Sale, including the EPA and the consideration received; (b) the application of the sale proceeds; and (c) the current financial position of the Company.

15    Such further or other relief be granted as the Court deems appropriate.

16      The Petitioner's costs of and incidental to this Petition shall be paid out of the assets of the Company on an indemnity basis.

And your Petitioner will ever pray etc.

Dated the 16th day of June 2026



———————————————

**KSG**

**NOTE**: This Petition is intended to be served on the Company.

This Petition was presented by KSG whose address for service is 4th Floor, One Capital Place, Shedden Road, George Town, PO Box 2255, KY1-1107, Grand Cayman, Cayman Islands.